NICHOLSON TRANSIT COMPANY, a corporation, as Owner of THE Steamer ADRIAN ISELIN, Libelant,

v.

GREAT LAKES TOWING COMPANY, a corporation, as Owner of the Tugs Texas and Utah,

and

Red Arrow Steamship Company, a corporation, as Owner of the Steamer Joe S. Morrow, THE Steamer JOE S. MORROW, her engines, boilers, etc., THE Tug TEXAS, her engines, boilers, etc., THE Tug UTAH, her engines, boilers, etc., Respondents.

No. 3611.

United States District Court
N. D. Ohio, E. D.

Jan. 28, 1960.

Supplemental Opinion March 24, 1960.

McCreary, Hinslea & Ray, Lucian Ray, Cleveland, Ohio, Percy J. Power, Detroit, Mich., for libelant.

Robert B. Preston, Cleveland, Ohio, for Great Lakes Towing Co.

Robert Branand, Johnson, Branand & Jaeger, Cleveland, Ohio, for Red Arrow S. S. Co.

JONES, District Judge.

This case was tried for a week and submitted on oral argument.

 In the late afternoon of August 5, 1957, respondent Red Arrow Steamship Company's Steamer Joe S. Morrow discharged a cargo of iron ore at the lower Republic, Corrigan, McKinney dock, put her engines and sailing equipment in readiness and called upon re-

spondent Great Lakes Towing Company for two tugs to assist her down the Cuyahoga River to Lake Erie. The tugs Texas and Utah responded, the Utah taking the stern tow, the Texas the bow line. The movement was stern first. While the towing operation was to be in the sole charge of the tugs, the Morrow was fully equipped and ready to participate when called upon. Only once down the River was she requested to work her engines forward for about two minutes before reaching the New York Central Railroad drawbridge, which is the last River crossing before entering the Lake. The channel at the bridge is normally about 300 feet, and 25 feet deep, but, due to some dredging at the west end of the bridge, safe passage through the draw was reduced to some 75 to 85 feet. The Morrow had got pretty well into the draw when the Texas deciding that her bow was getting too close to the west abutment, started to pull her bow to the right, or to her port; deciding that the Morrow was swinging too rapidly to the east, the Texas, without first taking in the slack of its towline, started a full speed retreat or pull to check the swing of the bow eastwardly and by so doing caused the towline to snap.

According to the evidence of Captain Malloy of the Texas, he immediately gave the danger signal and shouted to some person, or persons, standing in the prow of the Morrow, calling upon them to drop the starboard anchor; not receiving any response, as he thought, he blew another danger signal, meanwhile the Utah, at the stern of the Morrow, sensing trouble from the blasts of the Texas and by the continued swing of the Morrow's bow to the east, was valiantly undertaking to pull the stern of the Morrow to port, hoping thus to check the swing of her bow. It was unsuccessful in preventing the bow's swing and consequent collision with the starboard side of the libelant's ship Adrian Iselin closely moored and loading at the Cleveland Stevedore Company dock on the east side of the River, about 600 feet below the New York Central bridge. By that time the Morrow was at an angle of thirty to thirty-five degrees across the channel. The contact was sufficient to bounce the Iselin away from the dock a few feet and back again, damaging several of her plates and causing water to get into her hold at about the Captain's quarters and below the deck on the starboard side. The Morrow struck at about her ninth hatch, a short distance aft of her Captain's quarters. There was no substantial damage to the Morrow. She was 440 feet overall in length and had a 52-foot beam. She was drawing six to seven feet forward and thirteen to fourteen feet aft, having taken on some water in her after tanks on the way down. Her speed downstream at the time of these events was approximately three miles per hour. The Iselin was 250 feet overall in length, with a beam of 43 feet. It was in no way at fault, it might be what modern jargon calls "a sitting duck".

The evidence of the Morrow, through Captain Vanderlake, was that his ship was at least a hundred to a hundred-fifty feet through the draw when the Texas bow line snapped; that he ordered the port anchor dropped within a few seconds thereafter and signalled on the Chadburn to the engineer, full speed ahead and put the rudder hard to starboard; the members of his crew who testified, and were in position to know, confirmed his testimony that the port anchor was let go and the rudder was put hard right; the Second Assistant Engineer and his Chief confirmed him in the order of full speed ahead; that within five or six seconds the engines of the Morrow were operating at full speed ahead. Hertz, the Captain of the Utah, at the stern, I believe stated that the engines were working ahead, on hard right rudder.

If Captain Vanderlake needed further confirmation of an unimpeachable character as to the working of his engines forward, it may be found in the registration of the engine revolutions. He testified that he had them going for about two minutes from the snapping of the towline until the collision occurred. This, together with the conceded two

minutes use coming down the River checks most precisely with the total revolutions registered from the time of leaving the lower dock where the tow started up to the collision point.

It was his further testimony when these events began that his ship had commenced to lap the moored Iselin.

What more can be said to bring out the probable truth as to where the fault lay for this collision? His account impressed me as the most lucid and rational of all those who gave evidence as to the sequence of events, and his impressions as the most probable explanation of how the collision came about.

Malloy's testimony was not, in my opinion, consistent with the physical situation and events leading up to the contact. He seemed uncertain at times and, as I may say, rather unsure and not too concerned with his own efforts to avoid or rescue his ship from the clearly imminent disaster. He seemed to take the position that it was up to the Morrow to extricate herself from the position in which she was placed by reason of the snapping of his towline. He gave the impression of a hopeless, helpless situation that called for nothing further from him in the way of duty or obligation to avert the certainty of collision. What could he have done, assuming the towline snapped at the point where he testified it did? At his distance away from the moored vessel he could have secured another starboard towline, or he had time to put his nose into the prow of the Morrow at the port bow—unless, perchance, the port anchor chain already was in the way of such a movement— I apprehend, however, the nearness to contact with the Iselin really would have made it hazardous to undertake such an heroic effort. This means that the towline parting and other incidents thereafter occurred more nearly at the distances and time testified by Captain Vanderlake.

The respondent Great Lakes Towing argues that the Morrow could have given the ship a greater thrust forward by additional power but I am unable to say or to find that added power would have saved the day under the circumstances existing at the time. Great Lakes Towing argued that the Morrow should have let go her starboard anchor with greater chain. Which anchor would have done the most good in these circumstances is difficult to say. I think Captain Vanderlake chose the port anchor because he thought the anchor chain fouling under or across the bow of the Morrow might have more immediate effect in checking the swinging to port than would the starboard anchor. In my opinion, his idea was right, but I further think the contact of the collision was too imminent for much retarding of the swing of the bow from that direction. A starboard anchor would have been of no avail and, of course, as I said before, the Texas made no effort to pick up a starboard tow.

There was some mention of wind direction and velocity, northeast at fifteen miles per hour, but I find it was not a factor of any consequence in the movements of the tow. If it had any effect it would have tended to check the eastward swing of the Morrow's bow.

In substantially these circumstances, the libelant claims that damage to its vessel the Adrian Iselin was brought about by the negligent navigation of the respondent Great Lakes' tugs which directly caused the collision and consequent damage; it was asserted in its libel that the Morrow may have contributed thereto by its failure to use means at her command to jump into the breach and avoid the consequences of the initial fault of the tug Texas.

It is my considered judgment that the efficient and proximate cause of the Morrow colliding with the Iselin was the conduct of the bow tug Texas,—its operation was not carried on with due regard to the circumstances existing and well known to its Captain.

Under the evidence before me I find that the Morrow did every reasonable act consistent with good seamanship and the safety of the two vessels to avoid or avert the collision, considering the time

and distance from the parting of the towline and the point of collision, as I view the more credible evidence upon those items.

Great Lakes contends, as was said above, that the Morrow failed to drop its starboard anchor and take such other safety measures upon the breaking of the bow towline as to cause or directly contribute to the collision; and that the damages should be divided.

Unfortunately for Great Lakes, the limited time elapse from the snapping of the Texas bow line to the contact afforded little effective response and cooperation from the Morrow—not over three minutes, and probably less, was about all that remained to stop the Morrow or the eastward swing of its lost bow.

Under the evidence, as I view it, the Morrow must be exonerated from any fault. Judgment may be entered accordingly.

If it is considered necessary or required that findings of fact and conclusions of law be adopted under Admiralty Rule No. 46½, 28 U.S.C.A. libelant may prepare and present them for the Court's consideration. Upon advice of either party that agreement on damages can not be had, the Court will appoint a Master Commissioner to hear and report.

### Supplemental Opinion.

The findings and conclusions tendered by Red Arrow Steamship Company constitute a review of the court's memorandum and are not what I conceive Admiralty Rule 46½ to provide. Only ultimate facts are necessary to be found and legal conclusions stemming from such findings are all that are required. In any event, the libelant was to have furnished findings and conclusions if it was thought necessary, and the libelant has accepted the court's view that that memorandum is an adequate statement of findings of fact and conclusions of law under Admiralty Rule 46½.

However, I suppose, since the Morrow was exonerated from fault causing or contributing to the disaster, Red Arrow is entitled to have a judgment or decree of dismissal of the libel as to it entered of record.

On the question of its right to an award of costs and expenses, including attorneys' fees, for defending against the libel of the Nicholson Transit Company, I have made some examination of such claim and the objections filed by Great Lakes.

It must be borne in mind that Great Lakes did not implead Red Arrow, nor was Great Lakes responsible for Red Arrow's presence as a respondent—the Nicholson Transit Company, owner of the Iselin, as libelant, brought Red Arrow into the case as a respondent jointly liable for the damage to its vessel. Red Arrow's claim is that its expense was caused by the fault of Great Lakes in its towing operation and that it, Red Arrow, is entitled to indemnification for its costs and expenses on that basis. In other words, that liability for such expense was implied in the towage contract but, as I see it, no such provision was contemplated by the cross-claim of Red Arrow since there is nothing in its cross-claim to justify any such implication. Red Arrow was seeking indemnification against any fault and damage found against its vessel under tow of Great Lakes' tugs, but its vessel, the Morrow, was exonerated completely by the court and that is the end of the matter.

It is my judgment that expenses and fees for defending an action brought by a third party are not chargeable to an indemnitor unless by express agreement, or as part of the damage for which indemnity is granted. Such liability for costs and expenses was not contemplated and no evidence was tendered upon that theory.

It is possible that such an allowance could have been considered had Great Lakes impleaded Red Arrow and been unsuccessful in shouldering any of the fault on the Morrow; nor can I find that Red Arrow, already in the litigation as a respondent, was put to any extra costs or expenses in defending the cross-claim of Great Lakes.

In the circumstances here I can find no valid basis for such an allowance of costs and expenses as moved for by the Red Arrow Steamship Company and, accordingly, its motion in that respect will be denied.

A decree of dismissal may be entered for Red Arrow Steamship Company as to any liability to the Nicholson Transit Company, libelant, and further decree may be entered dismissing the cross-claims of Great Lakes and of Red Arrow. These matters, I believe, were not covered by the interlocutory decree furnished by the libelant and entered March 22, 1960.